

FILED BY __AW__ D.C.

**Aug 22, 2024**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

Case No. **24-20363-CR-RUIZ/LOUIS**

18 U.S.C. § 371
18 U.S.C. § 1957

**UNITED STATES OF AMERICA**

**vs.**

**ISSA ASAD and**
**Q LINK WIRELESS, LLC,**

**Defendants.**
_____/

## INFORMATION

The United States Attorney charges as follows:

## GENERAL ALLEGATIONS

At all relevant times:

1.     Defendant **ISSA ASAD** was a resident of Broward County, Florida.

2.     Defendant **Q LINK WIRELESS, LLC ("Q LINK")** was a telecommunications provider headquartered in Dania Beach, Florida.  **Q LINK** was wholly owned by Quadrant Holdings Group LLC ("Quadrant"), which itself was wholly owned by **ASAD.  ASAD** was **Q LINK**'s Chief Executive Officer and controlled its operations.

3.     **Q LINK** participated in a federal government benefits program called Lifeline, which was administered by the Federal Communications Commission ("FCC"), an agency of the United States government.  Lifeline made basic communications services more affordable for low-income consumers.  Lifeline provided subscribers a deep discount on qualifying monthly cellphone service, broadband Internet service, or bundled voice-broadband packages purchased from participating telecommunications providers.  The discount helped ensure that low-income

consumers could afford 21st century connectivity services and the access they provide to jobs, healthcare, and educational resources..

4.     **Q LINK**, as a telecommunications provider, participated in the Lifeline program by offering free telephone and Internet services to low-income customers, and seeking reimbursement for those services from a United States Treasury bank account administered by the FCC, after submitting documentation about its Lifeline customers and affirming its compliance with program rules.

5.     Congress created the Paycheck Protection Program during the Covid-19 pandemic to authorize forgivable loans to small businesses for job retention and certain other expenses. Eligible companies could get a second draw on one of these loans if the business experienced a 25 percent reduction in gross receipts between comparable quarters in 2019 and 2020.  **ISSA ASAD** applied for, and received, a second draw Paycheck Protection Program loan for **Q LINK**.

## COUNT 1
### Conspiracy to Commit Offenses Against, and to Defraud, the United States
### (18 U.S.C. § 371)

1.     Paragraphs 1-4 of the General Allegations section of this Information are re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around 2012, and continuing until at least in or around 2021, in Broward Count, in the Southern District of Florida, and elsewhere, the defendants,

**ISSA ASAD and
Q LINK WIRELESS, LLC,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with each other and with others:

2

        a.      to commit an offense against the United States, that is, to embezzle, steal, purloin, and knowingly convert to their own use or the use of another, any record, voucher, money, or thing of value of the United States or of any department or agency thereof, having an aggregate value of more than $1000, and to receive, conceal, and retain the same with intent to convert it to their own use and gain, knowing it to have been embezzled, stolen, purloined and converted, in violation of Title 18, United States Code, Section 641;

        b.      to commit an offense against the United States, that is, to knowingly and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing such scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343; and

        c.      to defraud the United States and its agencies by impeding, impairing, obstructing, and defeating the lawful governmental functions of the United States.

## PURPOSES OF THE CONSPIRACY

    3      It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by: (a) seeking and retaining millions of dollars in Lifeline reimbursement funds to which they were not entitled; (b) using false and fraudulent pretenses, representations, promises, and making material omissions, to obtain and to retain those funds; (c) using those funds for the benefit of the defendants and their co-conspirators; and (d) making false

3

statements and engaging in other fraudulent activities designed to conceal the commission of the offense.

4       It was an additional purpose of the conspiracy for the defendants and their co-conspirators to interfere, by deceit, craft, and trickery, with the lawful function of the United States and its agencies, including the FCC, to administer and oversee the Lifeline program in the manner consistent with the program's goals and requirements.  This government function included but was not limited to (1) ensuring that Lifeline funds, including reimbursements to providers such as **Q LINK**, were spent in furtherance of the program's goals; (2) ensuring that providers accurately reported, when seeking reimbursement, whether and how customers used their phones, and otherwise complied with program rules; and (3) ensuring that customers were given truthful information about their rights under the program, including about the right to decline service from a provider if no longer wanted or needed.

### MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purposes of the conspiracy included, among others, the following:

### False Claims to the FCC and to Customers About Lifeline

5.      **Q LINK** participated in the Lifeline program by providing telecommunications services to low-income customers that it claimed qualified for benefits under that program.  **Q LINK** then sought reimbursement from the United States government for the services it claimed to provide to Lifeline customers.  At all relevant times, **ISSA ASAD** directed **Q LINK**'s activities in connection with the Lifeline program.

6.      **Q LINK** and **ISSA ASAD** knew that the Lifeline program contained strict rules for

4

reporting customer eligibility and activity and for seeking reimbursement.  For example, **Q LINK** and its employees, including **ASAD**, understood that, for **Q LINK** to seek reimbursement under the Lifeline program for customers receiving a free basic service, the customers had to: (1) be beneath a certain income threshold or enrolled in a program such as Medicaid, Food Stamps, and other benefits programs; and (2) "use" their phones.  **Q LINK** and **ISSA ASAD** understood that **Q LINK** was required to de-enroll and stop seeking payment for customers who had not used their cellphones during a specified time frame, and that "usage" was defined as the customer completing at least one affirmative act within that time frame such as placing a call, answering a call (from someone other than **Q LINK**), sending a text, buying minutes/data, or confirming with **Q LINK** that they wanted to keep the service.

7.      **ISSA ASAD** directed employees to monitor **Q LINK**'s customers' cellphone usage, ostensibly to ensure that it complied with the FCC usage rules described above before **Q LINK** sought payment for the customers under the Lifeline program. **ASAD** ultimately approved all **Q LINK** customers billed to the Lifeline program.

8.      **Q LINK** and **ISSA ASAD** submitted and caused to be submitted false and fraudulent claims to the FCC for customers who were not using their cellphones according to the FCC usage rules.  **Q LINK**, **ASAD** and others also misled and tricked the FCC into thinking customers were using their cellphones by manufacturing cellphone activity to pass off as usage and by engaging in coercive marketing techniques to get people to remain **Q LINK** customers.

9.      As an example, in a practice called an "ESN Swap" directed by **ISSA ASAD**, **Q LINK** employees took lists of Lifeline cellphone numbers for customers who were not using their phones, and placed outbound calls by temporarily swapping the customer's electronic serial

number ("ESN") assigned to the physical cellphone for the ESN number of a cellphone in Q LINK's shipping department. **ASAD** devised this scheme, and carried it out between approximately 2013 and 2016, to make it appear in the cellphone records as if the **Q LINK** customer completed an outbound call and thereby engaged in cellphone activity that would count as usage under the FCC Lifeline program had it actually happened.

10.     **ISSA ASAD** and others at **Q LINK** devised scripts to be played automatically for **Q LINK** customers, and to be used in live customer service conversations, which contained false and misleading information about customers' rights and the Lifeline program, as well as false threats to customers that their other government benefits were at risk if they did not continue as **Q LINK** subscribers.

11.     At the instruction of **ISSA ASAD** and another employee, a **Q LINK** software engineer set up auto-dialers to originate a high volume of outbound calls from **Q LINK** to customers who were not using their cellphones to trick them into answering the phone to assent to **Q LINK**'s Lifeline services, including by using local area codes not facially associated with **Q LINK** and spoofing customers' own cellphone numbers to deceive customers into thinking a **Q LINK** representative was not on the other end. **Q LINK** and **ASAD** engaged in this deceptive call activity, a practice that continued until at least June 2021, in order to trick and mislead customers into pressing a button to agree to remain **Q LINK** customers so that **Q LINK** and **ASAD** could keep billing the Lifeline program.

12.     **Q LINK** purposefully made it difficult if not impossible for customers to cancel service. In one recorded customer service call, a customer who called to cancel due to a non-working cellphone asked the **Q LINK** customer service representative "do you want me to throw

it in the garbage?," and the representative responded: "Just make sure you continue to use the device at least once every 30 days."

### Obstruction of FCC Investigation

13.     By 2014, **Q LINK** and **ISSA ASAD** knew that the FCC was investigating whether **Q LINK** was submitting claims to the Lifeline program for customers who were not using their cellphones. As part of this investigation, the FCC made various requests to the **Q LINK**, including requests for cellphone records purporting to document cellphone usage for customers as to which **Q LINK** had received reimbursement under the Lifeline program.

14.     In order to deceive the FCC and continue billing, **Q LINK** and **ISSA ASAD**, with the help of other individuals, manufactured cellphone activity on behalf of **Q LINK** customers who were not using their cellphones between 2015 and June 2021. **Q LINK** and **ASAD** provided records to the FCC purporting to show this cellphone usage for customers who were not using their cellphones, including records for phones in the physical possession of FCC because frustrated customers had turned the devices in to the agency.

15.     Additionally, in or around 2019, **Q LINK** provided false and manipulated cellphone records to the FCC for at least two customers who were not using their cellphones because their cellphones were physically at the FCC's headquarters. Among other things, **Q LINK** and **ISSA ASAD** took records of unchecked voicemails, some of which were left by phone numbers controlled by **Q LINK** and **ASAD** and tried to pass the voicemails off to the FCC as answered voice calls (answered voice calls would have counted as cellphone usage, unchecked voicemails would not). In addition, **ASAD** changed a spreadsheet header from "voicemail" to "voice" to leave the FCC with the false impression that the call records contained voice calls.

16.     In January 2020, prompted in large part by the FCC investigation revealing that **Q LINK** and **ISSA ASAD** were billing for cellphones in the possession of the FCC, the FCC issued an advisory notice stressing the importance to the Lifeline program of the usage requirements. Among other thing, the FCC notice stated that incoming voicemails to customers do not count as usage and reminded Lifeline providers to "take appropriate remedial measures … including amending past [Lifeline claims]." Despite being aware of this notice, at no point did **Q LINK** or **ASAD** amend past Lifeline claims for customers who were not using their cellphones or return any of the Lifeline payments.

17.     Between 2013 and 2019, **Q LINK** received approximately $618 million from the Lifeline program, approximately $109 million of which resulted from the fraud scheme. **ISSA ASAD** personally received approximately $75 million from **Q LINK** between 2013 and the end of 2021. **Q LINK** and **ASAD** never returned any money to the FCC, instead continuing to bill the FCC Lifeline program after 2019, including for customers that **Q LINK** should have stopped billing because the customers were not using their cellphones.

<u>**OVERT ACTS**</u>

In furtherance of the conspiracy and to achieve the objects and purpose thereof, at least one conspirator committed and caused to be committed in the Southern District of Florida, and elsewhere, at least one of the following overt acts, among others:

1.     On or about February 10, 2012, **Q LINK** submitted a compliance plan to the FCC agreeing to "implement a non-usage policy whereby it will de-enroll Lifeline customers" who were not using their phones according to the regulations.

2.     On or about November 8, 2012, in an FCC Form 497 Lifeline Worksheet for **Q**

8

LINK signed by **ISSA ASAD** as its CEO, **ASAD** certified that "my company is in compliance with all of the Lifeline program rules and, to the extent required, ha[s] obtained valid certifications for each subscriber for whom my company seeks reimbursement."

3.      On or about August 25, 2015, **Q LINK** submitted a petition to the FCC, **ISSA ASAD** cc'ed, to allow **Q LINK** to provide Lifeline services in certain states representing that **Q LINK** "will not seek reimbursement . . . for inactive subscribers who have not used the service for a consecutive 60-day period."

4.      On or about May 9, 2018, in an FCC Form 497 Lifeline Worksheet for **Q LINK** signed by a compliance director, **Q LINK** certified that it "is in compliance with all of the Lifeline program rules and, to the extent required, ha[s] obtained valid certifications for each subscriber for whom my company seeks reimbursement."

5.      On or about March 22, 2019, **ISSA ASAD** changed a cellphone record header from "voicemail" to "voice" and provided it to the FCC through **Q LINK**, in order to give the FCC the false impression that unchecked voicemails on customers' cellphones were completed calls.

6.      On or about September 10, 2019, **Q LINK** received an email from a **Q LINK** customer with the subject "My account incorrectly shows texts used," stating that: "Since I now suspect your firm is faking usage to get some government funding I will take time later this week to alert various US government agencies (FCC, FTC, IRS, etc)."

7.      On or about September 25, 2019, using his personal telephone, **ISSA ASAD** conducted a Google search for an FCC press release titled "Sprint Received Lifeline Subsidies for 885,000 inactive subscribers."

8.      On or about September 26, 2019, using his personal telephone, **ISSA ASAD**

conducted a Google search for "non usage lifeline."

9.      In or around March 2020, **ISSAD ASAD** and another **Q LINK** employee devised the following automated script to be played for **Q LINK** customers, as a means to deceive the customers into remaining enrolled with **Q LINK**:

| | |
|---|---|
| Hello, your Medicaid, Food Stamp and Lifeline benefits are about to get cancelled . To avoid cancelation of these benefits, press 1 now to indicate that you wish to remain enrolled in these government programs. Press 2 if you wish to speak to a representative about your government benefits To opt out of any future calls, press 3. | Weekend |

10.     On or about April 26, 2020, **ISSA ASAD** forwarded to another **Q LINK** employee the following email message received by **Q LINK** from a customer: "I informed you early enough that the telephone was stolen and needs to be disconnected. I keep getting usage messages and I don't have it . . . I have been cheated and scammed!!!"

11.     On or about May 14, 2020, **ISSA ASAD** forwarded to another **Q LINK** employee the following email message received by **Q LINK** from a customer:  "Never received telephone. I notified two representatives of the company both rude, spoke with two supervisors that same week and both were r[u]der than the reps.  Customer Service does not exist at your company . . . how can I have 97 text, see below."

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
### Money Laundering
### (18 U.S.C. § 1957)

1.      Paragraphs 1 and 5 of the General Allegations section of this Information are re-

alleged and incorporated by reference as though fully set forth herein.

2.      On or about June 23, 2021, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere,

**ISSA ASAD,**

did knowingly engage and attempt to engage in a monetary transaction affecting interstate commerce, that is, a wire transfer in the approximate amount of $1,000,000 into the account ending in x7063, by, through and to a financial institution, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, and knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

It is further alleged that the specified unlawful activity was wire fraud, in violation of Title 18, United States Code, Section 1343.

All in violation Title 18, United States Code, Sections 1957 and 2.

**FORFEITURE ALLEGATIONS**

1.      The allegations of this Information are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants have an interest.

2.      Upon conviction of a conspiracy to commit a violation, of Title 18, United States Code, Sections 641 or 1343, as alleged in this Information, the defendants shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

11

3.      Upon conviction of a violation of Title 18, United States Code, Section 1957, as alleged in this Information, the defendant shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 28, United States Code, Section 2461(c) and Title 18 United States Code, Section 982(b)(1).

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

ELIZABETH YOUNG
DEPUTY CHIEF, ECONOMIC CRIMES SECTION
ASSISTANT UNITED STATES ATTORNEY

DANIEL BERNSTEIN
ASSISTANT UNITED STATES ATTORNEY

JOHN C. SHIPLEY
SENIOR COUNSEL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA                    CASE NO.: __24-20363-CR-RUIZ/LOUIS__

v.

ISSA ASAD and                               **CERTIFICATE OF TRIAL ATTORNEY**
Q LINK WIRELESS, LLC, _____/

                                            **Superseding Case Information:**
                                            New Defendant(s) (Yes or No) _____
**Court Division** (select one)             Number of New Defendants _____
   ☒ Miami  ☐ Key West  ☐ FTP   Total number of new counts _____
   ☐ FTL    ☐ WPB

I do hereby certify that:
1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No___
   List language and/or dialect: _____
4. This case will take __0__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:
   (Check only one)                    (Check only one)
   I    ☒ 0 to 5 days        ☐ Petty
   II   ☐ 6 to 10 days       ☐ Minor
   III  ☐ 11 to 20 days      ☐ Misdemeanor
   IV  ☐ 21 to 60 days      ☒ Felony
   V   ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) No___
   If yes, Judge _____ Case No. _____.
7. Has a complaint been filed in this matter? (Yes or No) No___
   If yes, Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No___
   If yes, Judge _____ Case No. _____
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) No___
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No___
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No___
15. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? Yes___
16. Did this matter involve the participation of or consultation with now Magistrate Judge Marta Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? Yes___

By: _____
      ELIZABETH W. YOUNG
      Assistant United States Attorney
      Court ID No.   A5501858

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: ___ISSA ASAD_____

**Case No**: _____

Count #: 1

Conspiracy to Commit Offenses Against, and to Defraud, the United States_____

Title 18, United States Code, Section 371_____
**\* Max. Term of Imprisonment:** Five (5) years imprisonment
**\* Mandatory Min. Term of Imprisonment (if applicable):** N/A
**\* Max. Supervised Release:** Three (3) Years
**\* Max. Fine:** $250,000 or twice the gross gain or gross loss from the offense
_____

Count #: 2

Money Laundering_____

Title 18, United States Code, Section 1957_____
**\* Max. Term of Imprisonment:** Ten (10) years imprisonment
**\* Mandatory Min. Term of Imprisonment (if applicable):** N/A
**\* Max. Supervised Release:** Three (3) Years
**\* Max. Fine:** $500,000 or twice the amount of the criminally derived property involved in the transaction
_____

Count #:

_____

_____

**\* Max. Term of Imprisonment:**
**\* Mandatory Min. Term of Imprisonment (if applicable):** N/A
**\* Max. Supervised Release:**
**\* Max. Fine:**
_____

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

<u>PENALTY SHEET</u>

Defendant's Name:   <u>Q LINK WIRELESS, LLC</u>

Case No: _____

Count #: 1

<u>Conspiracy to Commit Offenses Against, and to Defraud, the United States</u>

<u>Title 18, United States Code, Section 371</u>
* **Max. Term of Imprisonment:**
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:**
* **Max. Fine:** $500,000 or twice the gross gain or gross loss from the offense

Count #:

_____

* **Max. Term of Imprisonment:**
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:**
* **Max. Fine:**

Count #:

_____

* **Max. Term of Imprisonment:**
* **Mandatory Min. Term of Imprisonment (if applicable):** N/A
* **Max. Supervised Release:**
* **Max. Fine:**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | Case No. |
|---|---|---|
| v. | ) | |
| | ) | **24-20363-CR-RUIZ/LOUIS** |
| ISSA ASAD, | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

HON. LISETTE M. REID, U.S. DISTRICT COURT JUDGE
*Judge's printed name and title*

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | **24-20363-CR-RUIZ/LOUIS** |
| Q LINK WIRELESS, LLC, | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*


_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*


_____
*Judge's signature*

HON. LISETTE M. REID, U.S. DISTRICT COURT JUDGE
*Judge's printed name and title*